# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-KA-02119-SCT

*JAMIE RANDOLPH a/k/a JAMIE ESTUS RANDOLPH*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/2/1999 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CLIFTON S. GADDIS |
| | JEFFREY LOEWER HALL |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEAN SMITH VAUGHAN |
| DISTRICT ATTORNEY: | E. LINDSAY CARTER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/10/2002 |
| MOTION FOR REHEARING FILED: | 2/11/2002; denied and opinion modified at paragraphs 57, 58 & 60 11/21/2002; corrected at paragraphs 22, 26, 28, 44, 63 & 64 12/13/2002 |
| MANDATE ISSUED: | 12/2/2002 |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1.     Jamie Randolph ("Randolph") was tried and convicted in the Forrest County Circuit Court of two counts of capital murder with the underlying offense of robbery of Ezra Keyes and Marques Williams. Randolph was sentenced to two consecutive life imprisonments without the possibility of parole for both counts. Following the denial of his motion for JNOV or in the alternative for a new trial, Randolph appealed to this Court.

## FACTS

¶2.     Randolph did not testify at trial. Beau Christopher Bates ("Bates") was indicted with Randolph as a co-defendant. Bates did testify at trial. According to Bates's testimony, on April 10,

1998, Randolph called and asked Bates to pick him up at his grandmother's house. Bates borrowed his girlfriend's, Yana Bowden ("Bowden"), car to get Randolph. While in the car, Randolph allegedly told Bates he wanted to rob Ezra Keyes ("Keyes"), a.k.a "Two-Tone", and asked to borrow Bates's gun. Randolph had mentioned robbing either Keyes or Tim Coleman ("Coleman") a few weeks earlier. When they arrived at Randolph's house, he went inside and paged Keyes. Randolph told Bates that he was going to page Keyes and ask for some "weed." When Keyes arrived with another person, Randolph allegedly got into Keyes car. A few minutes later, Randolph got out of the car, went into the house, returned, and got back into Keyes's car again. Then Bates heard two gunshots. Randolph told Bates to drive Keyes's car because he was too nervous. Bates looked into the car and saw two people. The people were not alive. Keyes was in the driver seat, and Marques Williams, as Bates later learned, was in the passenger seat. Bates drove the car with the two bodies in it. At one point they stopped the cars, and Bates thought he saw something move out of the corner of his eye. Bates told Randolph that Keyes was scaring him. Randolph told Bates to get the gun out of the backseat and shoot Keyes. Bates shot Keyes in the chest.

¶3.     Bates testified that he and Randolph took the car to an area where they parked and smoked. Then, Randolph started a fire in the car. Bates tried to extinguish the fire. Randolph told Bates that he was starting the fire to destroy all of the evidence. They burned some of their clothing, a tee-shirt and a jacket, in the fire.

¶4.     Randolph and Bates left the area in Bowden's car and returned to Carlo Bowden's house. When they arrived at the house, Bates asked Randolph for a wet wash cloth to clean himself; some of the blood was on him. Bates, also, had a shower and took off the pants he was wearing. Randolph stated that he had to leave Hattiesburg. The next morning, Randolph jumped into Bryan Croom's car

2

and that was the last time that Bates saw him. Bates later burned the rest of his clothes under a bridge.

¶5. Bryan Croom ("Croom") testified that he and Coleman took Randolph to the bus station in New Orleans. Randolph borrowed money from Coleman. Then Coleman and Croom left and returned to the coast. Croom testified that on April 10 he passed Randolph's house. He saw Randolph and Bates in Yana Bowden's car. Croom did not stop. As Croom left Rawls Springs, he saw Keyes's car; the vehicle was going towards Rawls Springs.

¶6. Mrs. Geraldine Lorch Bates ("Geraldine") is Bates's aunt. On Sunday April, 11, 1998, she discovered a burnt vehicle in an abandoned driveway on Lee Road in Forrest County. Jeff Byrd ("Byrd"), a crime scene technician, went to the crime scene and saw two burnt bodies in a car. One body was lying between the two front seats, and the second body was on its side leaning out the passenger door. The gas tank lid was open. A burnt .45 caliber semi-automatic Remington hand gun and some shell cases were found on the passenger side of the car.

¶7. The issues presented by Randolph overlap in certain instances and can be addressed more efficiently by combining some issues as follows:

> **I.      Whether the verdict of the jury was against the overwhelming weight of the evidence.**
>
> **II.     Whether the trial court erred in denying defendant's Motion for Directed Verdict at the close of the State's case. Whether the trial court erred in failing to grant the defendant's peremptory instruction that the jury must find the defendant not guilty. Whether the trial court erred in sentencing the defendant to the crime of capital murder, where defendant alleges he should have been sentenced to murder for the reason that there was insufficient proof of the underlying crime of robbery.**
>
> **III.    Whether the trial court erred when it overruled defendant's objection to Motion to suppress statement of the defendant made by Eddie Clark, for the reason that said statement was admitted in violation of the Fifth and Sixth Amendment Right to Counsel of the United States' Constitution**

3

and the Fourteenth Amendment to the Constitution of the United States of America and to the Constitution of the State of Mississippi.

IV.     Whether the trial court erred in sustaining each and every objection of the State and in overruling each and every objection by the defendant.

V.      Whether the trial court erred in refusing and/or amending defendant's proposed jury instructions.

VI.     Whether the trial court erred in allowing the prosecution to make prejudicial and inflammatory statements in closing arguments.

VII.    Whether the trial court erred in the selection of the jury and in the State's use of peremptory challenges.

VIII.   Whether the trial court erred in the admission of testimony by Bryan Croom.

IX.     Whether the trial court erred in admitting evidence of flight and granting a flight instruction.

X.      Whether the trial court erred in admitting photographs of the crime scene and the victims.

## ANALYSIS

I.      **Whether the verdict of the jury was against the overwhelming weight of the evidence.**

¶8.     Randolph asserts that the jury verdict was against the overwhelming weight of the evidence. He maintains that his conviction was based solely on unsubstantiated testimony of Bates, the co-defendant. Bates testified to killing Williams. Randolph also asserts no physical evidence substantiates Bates's testimony or ties Randolph to the crime scenes. Further, Randolph distinguishes his case from *Holmes v. State*, 660 So.2d 1225 (Miss. 1995), which holds that the testimony from a single credible witness is sufficient to sustain a conviction. He claims that the motives of a co-defendant to testify untruthfully is stronger than a victim to testify untruthfully.

¶9.     A motion for new trial challenges the weight of the evidence. *Sheffield v. State*, 749 So.2d 123, 127 (Miss. 1999). A reversal is warranted only if the lower court abused its discretion in

4

denying a motion for new trial. *Id*. (citing *Gleeton v. State*, 716 So.2d 1083, 1088 (Miss. 1998)).

This Court held in *McFee v. State*, 511 So.2d 130, 133 (Miss. 1987), that it has limited authority to

interfere with a jury verdict. The court looks at all the evidence in the light that is most consistent

with the jury verdict. *Id*. The prosecution is given "the benefit of all favorable inferences that may

reasonably be drawn from the evidence." *Id*.

> [I]f there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.

*Id*. at 133-34. *See also May v. State*, 460 So.2d 778, 781 (Miss.1984). This Court has held that

a new trial will not be given unless the verdict is so contrary to the overwhelming weight of the

evidence that an unconscionable injustice would occur by allowing the verdict to stand. *Groseclose*

*v. State*, 440 So.2d 297, 300 (Miss. 1983).

¶10.    As to the credibility of witnesses, this Court in *Gathright v. State*, 380 So.2d 1276 (Miss.

1980), has held that "in a criminal prosecution the jury may accept the testimony of some witnesses

and reject that of others, and that they may accept in part and reject in part the evidence on behalf of

the state or on behalf of the accused. In other words, the credibility of witnesses is not for the

reviewing court." *Gathright*, 380 So.2d at 1277 (citing *Davis v. State,* 320 So.2d 789 (Miss.1975)).

¶11.    In the case sub judice, the testimony at trial was that a few weeks prior to the crime, Randolph

mentioned wanting to rob either Keyes or Coleman. On the night in question, Randolph allegedly

told Bates he wanted to rob Keyes and asked to borrow Bates's gun. Randolph told Bates that he

was going to page Keyes and ask for some "weed." Keyes arrived with another person, and

Randolph got into Keyes's car. Randolph got out of the car, went into the house, returned, and got

back into Keyes's car again. Bates heard two gunshots. Randolph told Bates to drive Keyes's car

because he was too nervous to drive. Keyes was in the driver's seat, and Marques Williams was in

5

the passenger seat. Bates drove the car with the bodies of Keyes and Marques Williams in it. They stopped the cars, and Bates thought he saw something move out of the corner of his eye. Randolph allegedly told Bates to get the gun out of the backseat and shoot Keyes. Bates shot Keyes in the chest, and they took the car to an area where they parked and smoked. Then, Randolph started a fire in the car to destroy all of the evidence.

¶12.    Randolph and Bates went to Carlos Bowden's (brother of Yana Bowden) house to wash themselves. Randolph stated that he had to leave Hattiesburg, and the next morning, he left with Croom. Croom and Coleman took Randolph to the bus station in New Orleans and gave him money before returning to the coast.

¶13.    Based on the testimony at trial, the jury was provided substantial evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgement could have reached, and did reach, a verdict of guilty of two capital murders. Randolph clearly had the intent to rob Keyes and kill the two victims. In addition, Randolph's actions of burning the car and victims to destroy evidence and leaving Hattiesburg the following day was presented to the jury for consideration. As to Randolph's assertion that his situation is distinguishable from *Holmes*, it must be remembered that the jury weighs the evidence and credibility of the testimony from witnesses. *Gathright*, 380 So.2d at 1277. In this case, the jury weighed all the evidence and accepted the testimony of witnesses against Randolph and determined his guilt. This Court finds that the issue is without merit.

> **II.    Whether the trial court erred in denying defendant's Motion for Directed Verdict at the closing of the State's; whether the trial court erred in failing to grant the defendant's peremptory instruction that the jury must find the defendant not guilty; whether the trial court erred in sentencing the defendant to the crime of capital murder, where defendant alleges he should have been sentenced to murder for the reason that there was insufficient proof of the underlying crime of robbery.**

6

¶14.    Randolph asserts that the State failed to prove the underlying crime necessary for a conviction of capital murder. Randolph was charged with capital murder and the underlying crime of robbery. He claims that while the evidence may suffice for a double murder conviction, the evidence did not establish beyond a reasonable doubt that he deprived or even attempted to deprive anyone of their personal property. Randolph relies upon this same reasoning concerning whether the trial court erred in failing to give a peremptory instruction requiring a verdict of "not guilty" and concerning whether the trial court erred in sentencing him to the crime of capital murder instead of murder because the evidence alleged was insufficient proof of the underlying crime of robbery.

¶15.    Because issues involving directed verdicts, JNOVs, and peremptory instructions all challenge the legal sufficiency of the evidence, these issues will be addressed together.

### Standard of Review

¶16.    The standards of review for a denial of a directed verdict, peremptory instruction and a JNOV are identical. *Coleman v. State*, 697 So.2d 777, 787 (Miss. 1997). In *McClain v. State*, 625 So.2d 774, 778 (Miss. 1993), this Court held that a motion for JNOV, motion for directed verdict and a request for peremptory instruction challenge the legal sufficiency of the evidence. *McClain v. State*, 625 So.2d at 778. "Since each requires consideration of the evidence before the court when made, this Court properly reviews the ruling on the last occasion the challenge was made in the trial court. This occurred when the Circuit Court overruled [the] motion for JNOV." *McClain*, 625 So.2d at 778 (citing *Wetz v. State*, 503 So.2d 803, 807-08 (Miss. 1987)). On the issue of legal sufficiency, this Court held in *Wetz v. State*, 503 So.2d at 808, that reversal can only occur when the evidence of one or more of the elements of the charged offense is such that "reasonable and fair-minded jurors could only find the accused not guilty."

¶17.    Capital murder is defined as:

7

> The killing of a human being without the authority of law by any means or manner shall be capital murder in the following cases...(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of ...robbery...

Miss. Code Ann. § 97-3-19(2) (2000). Robbery is defined in Miss. Code Ann. § 97-3-73 (2000) as follows:

> Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of some immediate injury to his person, shall be guilty of robbery.

¶18. The elements of robbery are "(1) felonious intent, (2) force or putting in fear as a means of effectuating the intent, and (3) by that means taking and carrying away the property of another from his person or in his presence." *Caldwell v. State*, 481 So.2d 850, 853 (Miss.1985) (citing *Glenn v. State*, 439 So.2d 678, 680 (Miss.1983) (quoting *Crocker v. State*, 272 So.2d 664, 665 (Miss.1973))), *vacated on other grounds*, 479 U.S. 1075, 107 S.Ct. 1269, 94 L.Ed.2d 130 (1987).

¶19. In the case sub judice, the last challenge to the sufficiency of the evidence was made when the defense filed a written Motion for JNOV or in the alternative New Trial. The trial judge and defense counsel referred to the issues as a Motion for New Trial even though the written motion was in terms of a JNOV or new trial. The trial court denied the motion after hearing oral arguments stating simply that the motion was not "meritorious."

¶20. At trial, the testimony established that Randolph wanted to rob someone a few weeks prior to the murders. Bates testified that Randolph stated he wanted to borrow his gun and rob Keyes that night and actually called Keyes for "weed." In addition, Randolph got into Keyes car then went in the house and returned to Keyes vehicle and gun shots were heard by Bates shortly thereafter. Clearly, Randolph had the intent to rob Keyes, and he shot the two victims in the car using deadly force. The car was subsequently burnt to destroy evidence. Further, Bates and Bowden testified to

8

Randolph leaving with Croom. While Croom testified that he left Hattiesburg with Randolph and dropped him off at the bus station in New Orleans. Consequently, there is evidence in the record which is sufficient to support the jury verdict that Randolph was guilty of capital murder with the underlying crime of robbery. It is clear that a reasonable, fairminded juror could find beyond a reasonable doubt that Randolph was guilty of robbery and capital murder. Therefore, this Court finds that the State proved the crime of capital murder with the underlying crime of robbery and this issue is without merit.

> **III.** **Whether the trial court erred when it overruled defendant's objection to Motion to suppress statement of the defendant made by Eddie Clark, for the reason that said statement was admitted in violation of the Fifth and Sixth Amendment Right to Counsel of the United States Constitution and the Fourteenth Amendment to the Constitution of the United States of America and to the Constitution of the State of Mississippi.**

¶21. Randolph asserts that the trial judge abused his discretion in the admission of his statement to the authorities. He argues that his statement was inadmissible because it was made after he invoked his right to counsel, not in the presence of his counsel and it violated his Fifth Amendment right to counsel. Eddie Clark ("Clark"), investigator with the Forrest County Sheriff's Department, testified that he interviewed Randolph on April 30, 1998. Clark informed Randolph of his *Miranda* rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Randolph stated that he understood his rights and signed the form to that effect. However, Randolph did not sign the waiver of the rights and requested a lawyer. Clark terminated the interview at that time. Upon terminating the interview, Randolph stated "Man, I am six feet tall; I have done dug a hole and fell into it so far that I can't see out of it."

**Standard of Review**

9

¶22. During a suppression hearing, the trial judge sits as a fact finder. *Hunt v. State*, 687 So.2d 1154, 1160 (Miss. 1996). On appeal, the trial judge's findings can only be reversed for manifest error or if they are against the overwhelming weight of the evidence. *Id.*

¶23. An accused must be informed of his constitutional right, particularly his right to counsel and right to remain silent and the consequences of waiving those rights before police may initiate interrogation. *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1627-28, 16 L.Ed.2d 694 (1966). Once a person in custody invokes the right to counsel, any interrogation "must cease until an attorney is present." *Minnick v. Mississippi*. 498 U.S. 146, 111 S. Ct. 486, 112 L.Ed.2d 489 (1990) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). An accused is not subject to further interrogations by authorities, unless the accused initiates the communication. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981).

¶24. In *Riddle v. State*, 580 So.2d 1195, 1199 (Miss. 1991), this Court clarified this issue by holding the following:

> *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), reaffirmed and reinforced *Miranda*, *Edwards*, and *Roberson*, stating:
>
> ... [A] fair reading of Edwards and subsequent cases ... bar[s] police- initiated interrogation unless the accused has counsel with him at the time of questioning. Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney.

This Court also recognized a caveat and held that "[i]f the accused indicates in any manner that he wishes access to counsel, interrogation without counsel is allowed only if the accused himself initiates it.*" Id*. (citations omitted). In *Minnick*, the United States Supreme Court held that "*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested,

provided the accused has initiated the conversation or discussions with the authorities." ***Minnick v. Mississippi***, 498 U.S. 146, 156, 111 S.Ct. 486, 492, 112 L.Ed.2d 489 (1990).

¶25.   The trial court ruled that the statement was voluntary and provided the following reasoning:

> ...I took the opportunity of going over my notes during the recess and satisfying my mind that the Miranda rights had been given this defendant and he indicated that he understood those rights.  When asked to sign the waiver of rights, he indicated he would not sign and wanted to see an attorney.  And I think everybody in here agrees as that point in time that stops or tolls the running of any interrogation.  If they have to go back to re-interrogate him, then if he starts to make any statement that is not voluntary, then they would have to re-Mirandize him and go through the process all over again; I think everybody here agrees with that.
>
> But that's apparently not what happened in this case.  Apparently, after he indicated he wanted to see a lawyer, this defendant apparently at that point, and according to the testimony of the witness, ceased the interrogation.  And it was only after that that the voluntary statement was made, and as such, the Court would rule that it would not be necessary for him to be re-Mirandized since it was, in fact, a voluntary statement made by the defendant.  That being the case, I will allow that to be asked in the presence of the jury.

¶26.   If the voluntariness of a confession is in question, the accused has a right to determine if the confession was actually voluntary in nature. ***Kilcher v. State***, 753 So.2d 1017, 1024 (Miss. 1999). In  ***Agee v. State***, 185 So.2d 671, 673 (Miss.1966), the procedure was set forth which requires an evidentiary hearing. ***Id***.   The State has the burden of proving all facts prerequisite to admissibility beyond a reasonable doubt. ***Id.*** (citing ***Cox v. State***, 586 So.2d 761, 763 (Miss.1991); ***Neal v. State***, 451 So.2d 743, 753 (Miss.1984)).   "'This burden is met and a prima facie case made out by the testimony of an officer, or other person having knowledge of the facts, that the confession was voluntarily made without any threats, coercion, or offer of reward.'" ***Id***. (quoting ***Cox v. State***, 586 So.2d 761 (Miss.1991)).)

¶27.   In the case sub judice, Randolph does not challenge the voluntariness of the statement, but rather, that the statement was made after he invoked his right to counsel and with no counsel present. Furthermore, he claims that the statement was vague and nebulous and does not have a close nexus

11

to the crime in which he was charged. Despite Randolph's reliance upon invoking the right to counsel, the issue before this Court goes right to the heart of the voluntariness of the statement. Testimony showed that Randolph did not sign a waiver of rights and requested a lawyer. The authorities stopped the interview at this point in compliance with ***Minnick***. Without solicitation from the authorities, Randolph, then made his statement. The trial court determined that the statement was voluntary based upon testimony given by Clark. Accordingly, this Court finds that the issue is without merit.

IV. **Whether the trial court erred in sustaining each and every objection of the State and in overruling each and every objection by the defendant.**

¶28. Randolph asserts that the trial court abused its discretion and was outside the boundaries of the Mississippi Rules of Evidence in sustaining every objection by the State and overruling every objection by the defendant. However, Randolph fails to cite any specific instance from the record which demonstrates that the trial court abused its discretion or exceeded the M.R.E. in ruling on objections. Instead, Randolph broadly refers to each and every objection in the record.

¶29. This Court in ***Alexander v. State***, 759 So.2d 411, 418 (Miss. 2000), held the following:

There is a presumption that the judgment of the trial court is correct, and the burden is on the appellant to demonstrate some reversible error to this Court. ***Branch v. State***, 347 So.2d 957, 958 (Miss.1977). Supporting the argument of his issues with reasons and authorities is part of an appellant's burden on appeal. ***Pate v. State***, 419 So.2d 1324, 1325-26 (Miss.1982).

In ***Govan v. State***, 591 So.2d 428, 431 (Miss.1991), this Court did not review a weight of the evidence argument in which defendant stated that the defense's witness disputed the proof provided by the State and only ten lines was given by the defendant in his argument. "In the absence of meaningful argument and citation of authority, this Court generally will not consider the assignment of error." ***Id***. at 430. *See also* ***Stidham v. State***, 750 So.2d 1238 (Miss. 2000) (the appellant has a duty to show by plausible argument with supporting authorities how the lower court erred); ***Rush***

*v. State*, 749 So.2d 1024, 1026 (Miss. 1999)(appellate court did not address six issues raised on appeal where appellant did not discuss or cite authority); *Sumrall v. State*, 758 So.2d 1091, 1094 (Miss. Ct. App. 2000)(an issue not argued in brief is considered abandoned and waived).

¶30.    In the case sub judice, Randolph only makes the above cursory argument without either citing to specific instances in the record of an abuse of discretion by the trial court or without further reason or explanation.  Therefore, this Court finds that because there is no meaningful argument on this issue for appellate review, the issue is considered waived.

### V.      Whether the trial court erred in refusing and/or amending defendant's proposed jury instructions.

¶31.    Randolph next complains that the trial court erred in refusing four jury instructions.

### Standard of review

¶32.    This Court recently, stated that standard of review for a challenge to a jury instruction in *Agnew v. State*, 783 So.2d 699, 701 (Miss. 2001) as follows:

> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

(citations omitted).  *See also Woodham v. State*, 779 So.2d 158 (Miss. 2001); *Cohen v. State*, 732 So.2d 867 (Miss. 1998); *Heidel v. State*, 587 So.2d 835 (Miss. 1991).  "In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Coleman v. State*, 697 So.2d at 782 (quoting *Collins v. State*, 691 So.2d 918 (Miss.1997)).

### A. Instructions D-1 and D-10

¶33.    Jury instructions D-1 and D-10 pertain to the lesser offense of manslaughter.  The State argued that the facts did not justify the manslaughter instructions and a lesser murder instruction was already accepted by the court.  Both instructions were denied by the court.  At trial, the new trial hearing and on appeal, Randolph provides no evidentiary support for allowing the instructions.  *See Agnew*, 783 So. 2d at 702.  This Court has held that the appellant has a duty to show how the trial court erred by  plausible argument with supporting authority.  *Stidham v. State*, 750 So.2d 1238, 1243 (Miss. 2000).  Randolph failed to adequately support his assertion; and therefore, this Court finds that this issue is without merit.

### B. Jury Instruction D-11

¶34.    Randolph asserts that no evidence was presented at trial that indicated he committed or intended to commit robbery.  The instruction read as follows:

> The Court instructs the jury that in order to find the defendant guilty of capital murder, killing during the commission of a robbery, you must find beyond a reasonable doubt that the defendant intended to rob the victim prior to committing the facts that lead to his death.

The State argued that the instruction was an incorrect statement of law.  The trial court determined that the intent to rob could be simultaneous to the act of killing rather than prior to the killing as stated in the proposed instruction.  The trial court allowed Randolph to amend the instruction, but he chose to keep the instruction as written.  Consequently, the trial court refused the instruction.

¶35.    As to Randolph's assertion that no evidence was presented at trial indicating he either committed or intended to commit a robbery, the record reflects otherwise, and the contention is in error.  Bates testified that Randolph stated a few weeks prior to the crime that Randolph wanted to rob either Keyes or Coleman.  On the night of the crime, Randolph asked Bates if he could borrow his gun to rob Keyes.  Then Randolph initiated contact with Keyes for drugs.  When speaking with Keyes, Randolph persuaded Keyes to meet him.

14

¶36.   Randolph clearly had the intent to rob Keyes.  In addition, Randolph had the opportunity to correct the instruction and have it submitted to the jury.  Randolph chose not to make the amendments.  The trial court was within its discretion to refuse an incorrect statement of law.  See *Agnew*, 783 So.2d at 702.  Therefore, the issue is without merit.

### C. Jury Instruction D-24

¶37.   Randolph claims that Jury Instruction D-24 pertaining to a theory of the case was erroneously denied by the trial court.  The instruction read as follows:

> The court instructs the jury that if the evidence in this case presents two reasonable theories, one tending to indicate the Defendant, Jamie Randolph, is guilty and the other tending to indicate that he is innocent, it is the jury's duty to accept the theory favorable to the Defendant, Jamie Randolph, and find him not guilty.

A defendant is entitled to have jury instructions given which present his theory of the case. *Adams v. State*, 772 So.2d 1010, 1015 (Miss. 2000).  Randolph asserted that the theory was that Bowden was the accomplice.  The State argued that there was no theory of the case presented by Randolph.  The State further asserted that had Randolph taken the stand then there may have been another theory.  The trial court refused the instruction.  This Court finds that when a proposed instruction is unsupported by the evidence, the trial court is within its discretion to refuse the instruction. *Agnew*, 783 So.2d at 701.  This issue without merit.

### VI.   Whether the trial court erred in allowing the prosecution to make prejudicial and inflammatory statements in closing arguments.

¶38.   Randolph asserts that the prosecution made prejudicial and inflammatory statements about his drug use during closing argument.  Randolph concedes that he did not contemporaneously object to the comment at trial; and therefore, the trial judge did not have the opportunity to admonish the jury to ignore the remark.  Nevertheless, Randolph urges this Court to consider the comment. The only argument that Randolph asserts for not objecting at trial to the comment is for "strategy

15

reasons." Randolph included this issue in his Motion for New Trial which was denied in totality by the trial court.

¶39.    In *Williams v. State,* 512 So.2d 666, 670 (Miss. 1987), defense counsel did not object to prosecutor's closing argument, and this Court held that "[t]he failure of an objection is fatal." *Id*. at 670 (citing *Johnson v. State*, 477 So.2d 196 (Miss.1985)). This Court has held that "[i]f no contemporaneous objection is made, the error, if any, is waived." *Walker v. State*, 671 So.2d 581, 597 (Miss. 1995) (citing *Foster v. State*, 639 So.2d 1263, 1270 (Miss. 1994)). The contemporaneous objection rule is in place to enable the court to correct an error with proper instructions to the jury whenever possible. *Gray v. State*, 487 So.2d 1304, 1312 (Miss. 1986) (citing *Baker v. State* 327 So.2d 288, 292-93 (Miss. 1976)). To preserve an issue for appeal a contemporaneous objection must be made. *Ratliff v. State*, 313 So.2d 386 (Miss. 1988). *See also Box v. State*, 610 So.2d 1148 (Miss. 1992)(defendant failed to contemporaneously object to the prosecutor's remarks during closing argument and a motion for mistrial, made after jury verdict of guilty, was deemed too late); *Monk v. State*, 532 So.2d 592, 600 (Miss.1988)(contemporaneous objection during closing argument must be made, otherwise it is waived); *Gray v. State*, 487 So.2d 1304 (Miss. 1986)(contemporaneous objection during prosecution's closing argument must be made or it is deemed waived); and *Coleman v. State*, 378 So.2d 640, 649 (Miss.1979) (defendant failed to object to a statement by the district attorney in closing argument and a motion for mistrial after the jury had retired was deemed too late).

¶40.    In the case sub judice, Randolph admits that he did not contemporaneously object to the remark. In addition, he does not specifically cite the location in the record where the prosecution allegedly made an inflammatory remark pertaining to "drug use" during the closing argument.[1] This

_____

[1] Presumably it is the statement in reference to where Keyes's burnt car was found by Mrs. Lorch. "But Chris also told you that that's where he and the defendant, Jamie Randolph, used to go and sit and hide and smoke dope."

16

Court finds that the law is well settled on the point of the necessity of contemporaneous objections during closing arguments at trial. An objection was not made by Randolph during the prosecution's closing argument, and thus this issue is waived on appeal.

>    **VII.** **Whether the trial court erred in the selection of the jury and in the State's use of peremptory challenges.**

¶41. Randolph asserts that the trial court erred in ruling that the defense did not make a prima facie case under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The State struck seven (7) African-American jurors from the venire out of ten total peremptory challenges exercised by the State. Randolph is African-American. Furthermore, Randolph claims that the facts and circumstances raise the inference that the seven strikes were made for the sole purpose of striking minorities. In support of his argument, Randolph asserts that the State, in response to defense counsel's remark to the trial court that the State used seven challenges to remove African-Americans, replied "Damn right." The response by the State is, in Randolph's opinion, evidence that the strikes were intentionally used to keep African-Americans off the jury panel.

## Standard of Review

¶42. A reversal will only occur if the factual findings of the trial judge appear to be "clearly erroneous or against the overwhelming weight of the evidence." *Tanner v. State*, 764 So.2d 385, 393 (Miss. 2000) (citing *Stewart v. State*, 662 So.2d 552, 558 (Miss. 1995)); *Davis v. State*, 551 So.2d 165, 171 (Miss. 1989). "On appellate review, the trial court's determinations under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), are accorded great deference because they are based, in a large part, on credibility." *Coleman v. State*, 697 So.2d 777, 785 (Miss. 1997)(citing *Lockett v. State*, 517 So.2d 1346, 1349 (Miss.1987)). The term "great deference" has been defined in the *Batson* context as meaning an insulation from appellate reversal any trial findings which are not clearly erroneous. *Lockett v. State*, 517 So.2d at 1349.

17

¶43.    In **Batson**, the United States Supreme Court held that a peremptory challenge cannot be used to exclude venire-persons from jury service based on their race.  **Batson v. Kentucky**, 476 U.S. 89, 106 S.Ct.1712, 90 L.Ed.2d 69 (1986).  A peremptory challenge based on race constitutes a violation of equal protection.  **Id**. at 98.

¶44.    The necessary steps to resolve a peremptory challenge based upon **Batson** are cited in **Stewart v. State**, 662 So.2d at 557-58, as follows:

1.    The party objecting to the peremptory challenge must first make a prima facie showing that race was the criteria for the exercise of the peremptory challenge.
2.    If this initial showing is successful, the party desiring to exercise the challenge has the burden to offer a race-neutral explanation for striking the potential juror.
3.    The trial court must then determine whether the objecting party has met their burden to prove there has been purposeful discrimination in the exercise of peremptory challenges.

To establish the first prong, a prima facie case under **Batson**, the objecting party must show (1) that he/she is a member of a "cognizable racial group," (2) the prosecutor has exercised peremptory challenges toward the elimination of prospective jurors of his race, and (3) the facts and circumstances raised an inference the prosecutor used his peremptory challenges for the purpose of striking minorities.  **Conerly v. State**, 544 So.2d 1370, 1372 (Miss. 1989).

¶45.    In the case sub judice, the trial court cited **Batson** and listed the three requirements for a prima facie case pursuant to **Batson** in its ruling.  As to the remark by the State concerning the exclusion of the seven prospective jurors, the record reflects the following:

THE COURT:        For Batson purposes, let me go through, because we left off with Orr, the additional members of the African-American race stricken by the state, additional jurors, were none?

MR. HELFRICH:    Gloria Williams, No. 36. S8 was Tony Madden Caucasian.

THE COURT:        36 was S7.  That is the only African-American stricken.

MR. GADDIS:        Right.  First seven challenges exercised by the state in this case struck blacks from the jury.

MR. HELFRICH:    Damn right.

18

| MR. GADDIS: | Mr. Helfrich admits that by saying –. |
| MR. HELFRICH: | That's correct.  There are race neutral reasons for said strikes. |
| MR. GADDIS: | If the Court please, I would like for the Court to make whatever time is necessary–. |

When read in context, the statements made by the prosecution acknowledged that the strikes were made with race neutral reasons. However, the trial court listening to all the comments found that Randolph's motion did not overcome a prima facie case.

¶46.     The State wanted to supply its reasoning on the record, but the trial court would not allow this in light of this Court's ruling in *Puckett v. State,* 737 So.2d 322 (Miss. 1999).[2]  During the trial, Puckett raised a *Batson* challenge. *Puckett v. State*, 788 So.2d 752 (Miss. 2001).  Before the trial court determined if Puckett made a prima facie case pursuant to *Batson,* the State offered reasons for the peremptory strikes. *Id*.  Once reasons were offered by the State, the trial judge did not make on-the-record factual determination and inquiry independently as required by *Hatten v. State,* 628 So.2d 294 (Miss. 1993) regarding each peremptory challenge. *Id.*  This Court remanded the case to the trial court for a *Batson* hearing. *Id*.

¶47.     The record does not reflect the composition of the venire.  While the trial court determined that there was no prima facie case, the judge provided no reasoning for this Court's review. Normally, a trial court ruling is given great deference. *Coleman*, 697 So.2d at 785.  The trial court determined that Randolph did not make a prima facie case and, therefore, no further analysis would be required.

¶48.     Since  the reasoning and venire information for the denial of the prima facie case is not provided, this Court may analyze the peremptory strikes based upon the race neutral reasons cited

[2]Since the filing of the appeal in this case, this Court has denied Puckett's motion for rehearing and affirmed the trial court's denial of the *Batson* motion. *Puckett v. State*, 788 So.2d 752 (Miss. 2001).

on the record by the State during the motion for new trial. The race-neutral reasons for the peremptory strikes listed by the State were as follows:

1.  S-1: venire person's family member had pending drug charges, prosecutor previously represented venire person's son and son had a pending case in the prosecutor's office;
2.  S-2: venire person's husband had been charged with aggravated assault and she had to pay fines to the prosecutor's office for bad checks;
3.  S-3: venire person had dealings with the prosecutor's office, saw a newscast, stated in individual voir dire that she was not sure if she could sign a death penalty verdict and she knew witness Bates;
4.  S-4: venire person stated friends and family were arrested often on drug charges;
5.  S-5: venire person was previously charged with a DUI in Forrest County and the case was also a Forrest County case;
6.  S-6: venire person's brother was arrested for murder in Illinois, her cousin had pending drug charges and she thought the trial judge presided over her lunacy hearing;
7.  S-7: venire person stated she would not be comfortable sitting in judgment of her peers, brother had been arrested for strong arm robbery and she wavered on whether she could sign a death penalty verdict;
8.  S-8: venire person was Caucasian and had past criminal charges;
9.  S-9: venire person was Caucasian and on voir dire state she did not want to impose the death penalty but states on the questionnaire that she favored the death penalty in certain crimes, especially against children; and
10. S-10: venire person did not believe in the death penalty and was not very responsive to questions in individual or general voir dire.

¶49. In *Baldwin v. State*, 784 So.2d 148, 155 (Miss. 2001) this Court has upheld *Batson* race-neutral reason because of a juror's body language; demeanor; criminal history of prior arrests and convictions of a juror or a relative, including driving under the influence (DUI); social work and other types of employment; stated positions with respect to the death penalty; and discrepancies between juror questionnaires and voir dire. The Court in *Baldwin* stated that these reasons were also in the *Lockett v. State*, 517 So.2d at 1356-57, list, which is not exhaustive. *Id*. *See also Gary v. State*, 760 So.2d 743 (Miss. 2000)(accepted race neutral reasons for striking jurors included writing bad checks; being inattentive; and failure to disclose that juror was a victim of a crime); *Kelly v. State*, 783 So.2d 744 (Miss. Ct. App. 2000)(accepted race neutral reasons for striking juror included that juror read

about the case in the newspaper; had gone to school with the defendant; was friends with defendant's brother and other family members; and she knew witnesses on both sides). Clearly, this Court has upheld all the race neutral reasons for peremptory strikes expressed by the State.

¶50. The trial court did not err in its ruling. Great deference is afforded to a trial court's ruling. The record reflects the reasons for the State's strikes at the new trial. A review of the proffered reasons demonstrate that the race neutral reasons have been accepted by this Court. Therefore, this issue is without merit. In the alternative, any error as to the trial court's ruling is harmless in light of the race neutral reasons presented by the State.

### VIII. Whether the trial court erred in the admission of testimony by Brian Croom.

¶51. Randolph asserts that the admission of Brian Croom's testimony was erroneous and a discovery violation pursuant to *Box v. State*, 437 So.2d 19 (Miss. 1983). On the third day of trial, Croom stated that he saw the car of the victim, Keyes, riding toward Rawls Springs on the night of the murders. The trial court was informed of this statement as soon as it was discovered by the State.

¶52. This Court has enumerated the following procedures when a discovery violation is asserted before the trial court:

1. Upon defense objection, the trial court should give the defendant a reasonable opportunity to become familiar with the undisclosed evidence by interviewing the witness, inspecting the physical evidence, etc.
2. If, after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue.
3. If the defendant does request a continuance, the State may choose to proceed with trial and forego using the undisclosed evidence. If the State is not willing to proceed without the evidence, the trial court must grant the requested continuance.

*Norris v. State*, 735 So.2d 363, 364 (Miss. 1999)(citing *Cole v. State*, 525 So.2d 365, 367-68 (Miss. 1987)). When the State fails to follow discovery procedures a reversal is not warranted in every case.

21

*Box v. State*, 437 So.2d at 21. This Court has held that a "[n]on-discovered evidence may be admitted at trial if the party against whom that evidence is offered is given a reasonable opportunity to make adequate accommodation." *Robinson v. State*, 508 So.2d 1067, 1071 (Miss. 1987).

¶53. In the case sub judice, defense counsel claimed that they needed time to investigate the witness. The trial court overruled the *Box* objection by defense counsel. However, the trial court did allow defense counsel time to interview the witness prior to resuming trial the next day. In his brief, Randolph states that he was given a "reasonable opportunity to familiarize himself with the evidence by interviewing the witness on the evening before his testimony."

¶54. This Court finds that the trial court did not abuse its discretion in admitting Croom's testimony. The trial court denied the *Box* motion. Croom was already a listed witness in the trial and was disclosed to the defense. The trial court correctly limited Croom's testimony to information of his own personal knowledge. Croom's testimony before the jury was that he saw Randolph and Bates in Bowden's car. As Croom was leaving town, he saw Keyes's car going toward Rawls Springs. The defense was allowed time before the next day of trial to question Croom about his testimony. Croom was leaving town after bringing a friend home. Even though the additional information Croom offered was not known by the prosecution or defense, both sides had knowledge of Croom's identity since he was already on the witness list and scheduled to testify at trial. Therefore, the issue is without merit.

IX. **Whether the trial court erred in admitting evidence of flight and granting a flight instruction.**

¶55. Randolph next complains that the trial court erred in giving flight instructions to the jury. Randolph contends that the facts of his case are similar to *Fuselier v. State*, 468 So.2d 45 (1985). As such, the submission of the jury instruction S-10 and S-11 was prejudicial and resulted in his conviction. Randolph requests a reversal of the jury verdict.

¶56.    In regard to flight instructions, this Court has held that "flight is a circumstance from which an inference of guilt may be drawn and considered along with all the other facts and circumstances connected with the case." *Hubbard v. State*, 187 So.2d 885, 886 (Miss. 1966).  In *Brown v. State*, 690 So.2d 276, 294 (Miss. 1996), this Court held:

> '[A]n instruction that flight may be considered as a circumstance of guilt or guilty knowledge is appropriate only where that flight is unexplained and somehow probative of guilt or guilty knowledge.' *Reynolds v. State*, 658 So.2d 852, 856 (Miss.1995) (quoting *Fuselier v. State*, 468 So.2d 45, 57 (Miss.1985)). When determining whether a flight instruction is appropriate, we further have explained that two considerations are paramount:
>
> 1.    Only unexplained flight merits a flight instruction.
> 2.    Flight instructions are to be given only in cases where that circumstance has considerable probative value. *Banks v. State*, 631 So.2d 748, 751 (Miss.1994) (quoting *Pannell v. State*, 455 So.2d 785, 788 (Miss.1984)).

*See also* M.R.E. 404(b).  However, the evidence of flight is inadmissible if "there is an independent reason for flight known by the court which cannot be explained to the jury because of its prejudicial effect upon the defendant." *Fuselier v. State*, 702 So.2d 388, 390 (Miss. 1997).

¶57.    In *Fuselier*, this Court reversed and remanded  the conviction and sentence based upon the improper admission of flight evidence and flight instructions. *Fuselier v. State*, 468 So.2d at 57. Fuselier was a prison escapee at the time of his flight from law enforcement and his arrest for murder. He claimed that as an escapee, he had an independent reason for fleeing from authorities other than the murder of Gunter. *Id*.   The Court acknowledged that Fuselier was in a "no-win situation be either being required to explain his flight and the fact that he was a prison escapee or not explaining the flight and subjecting himself to a flight instruction." *Id*.  On a later appeal, this Court again reversed and remanded the conviction and sentence.  *Fuselier v. State*, 702 So.2d 388 (Miss. 1997).  In the later trial, flight evidence was admitted but no flight instruction was given to the jury. *Id*.

23

¶58.    In *Mack v. State*, 650 So.2d 1289, 1310 (Miss. 1994), a prison escapee was driving a stolen car at the time of arrest and this Court found that allowing flight evidence was error but that admission was harmless.  This Court held that the flight evidence "pale[d] in comparison to more direct evidence of guilt." *Id.*  Among the evidence cited was the fact that his two companions stated that Mack killed Fulton.  Some of the other evidence presented at trial  placed Mack at the crime scene by other witnesses, blood was on the vehicle that Mack drove, and  Mack threatened to kill a teenager if he revealed what he had seen. *Id.*;  *but see Tavares v. State* 725 So.2d 803 (Miss. 1998)(defendant did not appear on the day of her trial, bond was revoked and a warrant was issued for arrest at the time she was apprehended, however defendant denied the flight occurred and the trial court did not commit reversible error in admitting evidence and flight instructions).

¶59.    Randolph claims that by allowing the flight instructions, S-10 and S-11, his flight to Arizona was probative of his guilt and similar to *Fuselier*.  The basis for this argument by Randolph turns on the fact that when he was arrested in Arizona for the murder charge he was also subject to the jurisdiction of the trial court because of a warrant for possession of a controlled substance and auto burglary.  Randolph argues that the other charges pending against him act as an independent reason to explain his flight and were known by the trial court. He asserts that he is in the same position as *Fuselier* of either testifying or remaining silent and subjecting himself to a cloud of guilt.

¶60.    A review of the record reveals that Investigator Clark testified in a proffer before the court that Randolph was in custody on April 30, 1998, for two warrants for murder and a warrant for possession of a controlled substance.  There was an apparent indictment for auto burglary, however, Clark testified that he was not aware of that allegation.  Nevertheless, the case sub judice is distinguishable from *Fuselier*.  First, in *Fuselier*, the defendant was a prison escapee at the time of his flight and under those circumstances he would logically run from authorities. While Randolph had

24

a possession warrant and an alleged indictment for auto burglary at the time of his flight, it is not known whether he even knew of the warrant or indictment for these crimes. In other words, Randolph, unlike Fuselier, was not eluding a current prison sentence and detention period, which an escapee would be fully aware of and have full knowledge, at the time of his flight from Hattiesburg. Second, in *Fuselier*, the case relied mainly on circumstantial evidence, whereas the case before this Court more closely resembles *Mack*. There is sufficient direct evidence of Randolph's guilt apart from any inference regarding his flight. Any error that may have occurred in granting the flight instruction does not rise to the level of reversible error. Therefore, the trial court did not err in admitting the flight evidence and instructions, or to the extent that any error was committed, it was harmless error, consistent with our holding in *Mack*. This issue is without merit.

### X. Whether the trial court erred in admitting photographs of the crime scene and the victims.

¶61. Randolph asserts that the trial court erred in allowing certain crime scene photographs into evidence. Without identifying the particular photographs at issue other than citing burned victims and an arm with a watch, Randolph maintains that there was no probative value to the pictures especially since the identity of the victims was not at issue.[3] To support his complaint, Randolph relies on *Davis v. State*, 551 So.2d 165 (Miss. 1989).

### Standard of Review

¶62. This Court held that the admissibility of pictures of gruesome crime scenes is within the sound discretion of the trial court. *Chatman v. State*, 761 So.2d 851, 854 (Miss. 2001). Reversal of the trial court will occur only where there is a clear abuse of discretion. *Id*.; *Davis v. State,* 551 So.2d at 173. "The discretion of the trial judge 'runs toward almost unlimited admissibility regardless of the

---

[3]Presumably the photographs in issue are State's Exhibits 14, 15 and 16.

gruesomeness, repetitiveness, and the extenuation of probative value.'" *Spann v. State* 771 So.2d

883, 895 (Miss. 2000)(quoting *Williams v. State*, 544 So.2d 782, 785 (Miss. 1987)). Photographs

are considered to have evidentiary value in the following instances:

1.  'aid in describing the circumstances of the killing;
2.  describe the location of the body and cause of death;
3.  supplement or clarify witness testimony.'

*Spann v. State*, 771 So.2d at 895 (quoting *Westbrook v. State*, 658 So.2d 847(Miss. 1995)).

¶63.    In *Davis v. State,* 551 So.2d at 173, this Court held that "photographs of the victim should

not ordinarily be admitted into evidence where the killing is not contradicted or denied, and the

corpus delicti and the identity of the deceased have been established."    However, this Court stated

that photographs of bodies may be admitted into evidence if they have probative value, are not too

gruesome and are not used in an overly prejudicial or inflammatory way in a criminal case. *Id*.    In

*Davis*, this Court recognized that the defendant killed the victim and as such there was no need to

establish the identity of the killer or victim. *Id*.    The Court did find that the photographs had probative

value and were properly admitted into evidence. *Id.*

¶64.    Randolph erroneously claims that the photographs had no probative value especially because

the identity of the victims was not an issue.  First, it is important to note that unlike *Davis,* defense

counsel denied that Randolph had anything to do with the murder of either Keyes or Williams.

Second, the trial court admitted the photographs in an effort to be consistent with the admission of

a videotape of the crime scene.  Third, Jeff Byrd testified that Captain Rigel took the photographs.

In his testimony, Byrd described the position of the victims bodies as found at the scene.  Clearly, the

photographs had probative value in relation to the condition of the bodies as found by authorities and

the position of the bodies at the scene.  Accordingly, this issue is without merit.

## CONCLUSION

26

¶65.    For these reasons, the judgment of the Forrest County Circuit Court is affirmed.

¶66.    **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**
       **COUNT II: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT PAROLE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED.**
       **SENTENCES ARE TO RUN CONSECUTIVELY.**

       **McRAE, P.J., WALLER, DIAZ AND GRAVES, JJ., CONCUR.  SMITH, P.J., AND COBB, J., CONCUR IN RESULT ONLY.  CARLSON, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, P.J., WALLER AND COBB, JJ.  PITTMAN, C.J., NOT PARTICIPATING.**

       **CARLSON, JUSTICE, CONCURRING:**

¶67.    I agree with the conclusion reached by the majority, and I join its opinion.  I write separately to address in more detail a few of the issues discussed by the majority.

¶68.    As to Jury Instruction D-24, I agree that this instruction was properly refused by the trial court.  This instruction is the so-called "two-theory instruction" which we have said should be granted only in a case based entirely upon circumstantial evidence. *Kitchens v. State,* 300 So.2d 922, 926 (Miss. 1974)(citing *Coward v. State*, 223 Miss. 538, 78 So.2d 605 (1955)).  A circumstantial evidence case (for the purposes of granting a "two-theory" instruction) is one in which there is neither an eyewitness nor a confession to the crime.  *Mangum v. State*, 762 So.2d 337, 344 (Miss. 2000)(citing *Stringfellow v. State*, 595 So.2d 1320, 1322 (Miss. 1992)); *Keys v. State*, 478 So.2d 266, 267 (Miss. 1985).  Clearly, the case before us today is not based entirely on circumstantial evidence, and the trial court's denial of Jury Instruction D-24 was, therefore, eminently correct.

¶69.    Concerning Randolph's claim of a discovery violation based on the admission of Brian Croom's testimony, the trial court clearly did not abuse its discretion in allowing this testimony, for the reasons stated by the majority and consistent with the cases cited, beginning with *Box v. State*, 437 So.2d 19 (19.  The factors set out in *Box* and its progeny have now been codified, for easy

27

reference, via the discovery rule found in the Mississippi Uniform Rules of Circuit and County Court Practice, cited as "URCCC", as judicially enacted by this Court, effective, May 1, 1995. *See* URCCC 9.04(I).

¶70.    While I agree with the majority that the giving of the "flight instruction" was proper, based on the facts and circumstances of this particular case, and the applicable case law, the use of the flight instruction in this state can be described in one word – "dangerous."  In my years of experience as a trial judge, the flight instruction was very seldom requested by the prosecution and almost never given.  It simply is not needed.  While evidence of flight might be relevant, no legitimate purpose is served by the jury receiving an instruction from the trial court (which heightens the importance of the evidence in the eyes of the jury) highlighting for the jury the fact that the jury can consider evidence of flight as "a circumstance of guilt or guilty knowledge" when "that flight is unexplained and somehow probative of guilt or guilty knowledge."  *See Reynolds v. State*, 658 So.2d 852, 856 (Miss. 1995); *Fuselier v. State*, 468 So.2d 45, 57 (Miss. 1985).    The term "unexplained flight" is somewhat nebulous, anyway, and a trial court, by giving a flight instruction, simply puts itself in a position of possibly placing reversible error in an otherwise clean record.  If a trial court persists in giving a flight instruction, I suggest that it do so with great caution.

¶71.    All of this having been said, I agree with the majority that this case should be affirmed.

**SMITH, P.J., WALLER AND COBB, JJ., JOIN THIS OPINION.**